UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

RENE HERNANDEZ, REBECCA HESTON, : **ECF CASE**
JEFFREY STEINBERG, TRINITY GRAY, ERIC :
EBANKS, and WILLIAM ROGERS, individually :
and on behalf of all others similarly situated, : Case No. 11 CV 8472 (KBF)
 :
 Plaintiff, :
 :
 v. :
 :
 :
MERRILL LYNCH & CO., MERRILL LYNCH, : **Oral Argument Requested**
PIERCE, FENNER & SMITH INCORPORATED, :
and BANK OF AMERICA CORPORATION, :
 :
 Defendants. :
 :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


## DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR CONDITIONAL CERTIFICATION AND COURT-AUTHORIZED NOTICE

Michael D. Mandel (*pro hac vice*)
*mmandel@mcguirewoods.com*
Philip A. Goldstein (PAG-0908)
*pagoldstein@mcguirewoods.com*
McGuireWoods LLP
1345 Avenue of the Americas, 7th Floor
New York, New York 10105-0106
(212) 548-2100

Counsel for Defendants

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................. 1

STATEMENT OF THE FACTS ............................................................... 2

      A.    The Merrill Edge Advisory Center ............................................. 2

      B.    Each FSA Team Has Separate and Distinct Job Responsibilities............. 3

             1. Relationship Management Group ........................................ 4

             2. Prospecting Conversion Group ............................................ 5

      C.    Named and Opt-In Plaintiffs..................................................... 6

      D.    MLPFS' Policies Prohibit Working Off-the-Clock and Mandate
           that Non-Exempt Employees Record All Time Worked ......................... 7

      E.    The FSAs Positions Require the Regular Exercise of Discretion
           and Independent Judgment ......................................................... 9

ARGUMENT ................................................................................. 10

    I.     PLAINTIFFS BEAR THE BURDEN OF PROOF TO DEMONSTRATE
           THEY WERE SUBJECT TO A SINGLE DECISION, POLICY, OR
           PLAN THAT VIOLATED THE LAW ............................................. 10

    II.    PLAINTIFFS HAVE FAILED TO MEET THEIR BURDEN OF PROOF
           TO ESTABLISH THAT THEY AND THE PERSONS TO WHOM
           THEY WISH TO HAVE NOTICE ISSUED WERE VICTIMS OF A
           SINGLE DECISION, POLICY OR PLAN THAT VIOLATED THE
           LAW WITH RESPECT TO THEIR "OFF THE CLOCK" CLAIMS ............... 11

      A.    MLPFS Disseminated and Enforced Policies Requiring That
           Employees Accurately Record All of Their Time Worked and That
           They Be Paid For All Time Worked..................................... 12

      B.    Plaintiffs Have Presented No Evidence of a De Facto Policy
           Requiring or Even Permitting Off-the-Clock Work ............................. 13

      C.    Plaintiffs' Off-the-Clock Claims Will Require Individualized
           Analysis and Are Unsuitable For Collective Treatment ......................... 14

    III.    PLAINTIFFS HAVE FAILED TO MEET THEIR BURDEN OF PROOF
           TO ESTABLISH THAT THEY WERE VICTIMS OF A SINGLE
           DECISION, POLICY OR PLAN THAT VIOLATED THE LAW WITH
           REGARD TO THEIR MISCLASSIFICATION CLAIMS ................... 16

      A.    The Application of the Administrative Exemption To the Facts of
           This Case Prevents Plaintiffs From Establishing That They Were
           all Subject To A Single Decision, Policy or Plan that Violated the
           Law ................................................................................. 17

## TABLE OF CONTENTS
(continued)

                                                                                    **Page**

    B.    Plaintiffs Have Not Met Their Burden of Proof To Establish They Are Similarly Situated to Other FSAs, or that Other FSAs Are Similarly Situated to Each Other .............................................................. 21

IV.    PLAINTIFFS' PROPOSED NOTICE SHOULD BE REJECTED .................... 22

    A.    Plaintiffs' Proposed Notice is Objectionable ........................................... 23

    B.    Notice Should Be Disseminated By a Third-Party Administrator ........... 24

    C.    Plaintiffs Should Not Be Entitled to Post Notice at MEAC Call Centers or to Disseminate a Second Notice ............................................ 25

CONCLUSION ........................................................................................................... 25

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*Amendola v. Bristol-Myers Squibb Co.*,
   558 F. Supp.2d 459 (S.D.N.Y. 2008)...................................................................10

*Barnwell v. Corr. Corp. of Am.*,
   2008 U.S. Dist. LEXIS 104230 (D. Kan. Dec. 9, 2008).......................................24

*Darrikhuma v. Southland Corp.*,
   975 F. Supp. 778 (D. Md. 1997) (4th Cir. 1997) ...................................................15

*Diaz v. Elec. Boutique of Am., Inc.*,
   2005 U.S. Dist. LEXIS 30382 (W.D.N.Y. Oct. 17, 2005) ........................ 11, 16, 18

*Eng-Hatcher v. Sprint Nextel Corp.*,
   2009 U.S. Dist. LEXIS 127262 (S.D.N.Y. Nov. 13, 2009)..................12, 13, 14, 15

*Forney v. TTX Co.*,
   2006 U.S. Dist. LEXIS 30092 (N.D. Ill. Apr. 17, 2006) .................................18, 22

*Freeman v. Wal-Mart Stores, Inc.*,
   256 F. Supp.2d 941 (W.D. Ark. 2003)...................................................................22

*Gillian v. Starjem Rest. Corp.*,
   2011 U.S. Dist. LEXIS 115833 (S.D.N.Y. Oct. 3, 2011) ....................12, 13, 14, 15

*Guillen v. Marshalls of MA, Inc.*,
   2012 U.S. Dist. LEXIS 4364 (S.D.N.Y. Jan. 13, 2012) ("*Guillen II*").......................11, 13, 16

*Hamm v. TBC Corp.*,
   345 Fed. Appx. 406 (11th Cir. 2009)......................................................................24

*Hinojos v. Home Depot, Inc.*,
   2006 U.S. Dist. LEXIS 95434 (D. Nev. Dec. 1, 2006)..........................................15

*Hinterberger v. Catholic Health Sys.*,
   2009 U.S. Dist. LEXIS 97944 (W.D.N.Y. Oct. 21, 2009) ................................24, 25

*Hoffman-La Roche, Inc. v. Sperling*,
   493 U.S. 165 (1989).........................................................................................10, 24

*In re Wells Fargo Home Mortg. Overtime Pay Litig.*,
   527 F. Supp.2d 1053 (N.D. Cal. 2007) ..................................................................17

*Khan v. Airport Mgmt. Servs., LLC,*
    2011 U.S. Dist. LEXIS 133134 (S.D.N.Y. Nov. 16, 2011) ................................11, 13, 16, 21

*Lawrence v. Philadelphia,*
    2004 U.S. Dist. LEXIS 8445 (E.D. Pa. Apr. 29, 2004) ...........................................12

*Mike v. Safeco Ins. Co. of Am.,*
    274 F. Supp.2d 216 (D. Conn. 2003) .............................................................18, 19

*Morales v. Plantworks, Inc.,*
    2006 U.S. Dist. LEXIS 4267 (S.D.N.Y. Feb. 1, 2006) ...............................11, 16, 19

*Pfohl v. Farmers Ins. Group,*
    2004 U.S. Dist. LEXIS 6447 (CD. Cal. Mar. 1, 2004) .........................................18

*Prizmic v. Armour, Inc.,*
    2006 U.S. Dist. LEXIS 42627 (E.D.N.Y. June 12, 2006) .................................11, 16

*Saleen v. Waste Mgmnt., Inc.,*
    2009 U.S. Dist. LEXIS 49891 (D. Minn. June 15, 2009) ......................................13

*Sand v. Greenberg,*
    2011 U.S. Dist. LEXIS 36266 (S.D.N.Y. Mar. 22, 2011) ......................................24

*Seever v. Carrols Corp.,*
    528 F. Supp.2d 159 (W.D.N.Y. 2007) ...............................................................14

*Singh v. City of New York,*
    418 F. Supp.2d 390 (S.D.N.Y. 2005) .................................................................14

*Thompson v. Speedway SuperAmerica, LLC,*
    2009 U.S. Dist. LEXIS 3816 (D. Minn. Jan. 20, 2009) .........................................13

*Trinh v. JP Morgan Chase & Co.,*
    2008 U.S. Dist. LEXIS 33016 (S.D. Cal. Apr. 22, 2008)...........................16, 21, 22

*Wal-Mart Stores, Inc. v. Dukes,*
    131 S.Ct. 2541 (2011)...................................................................................19

*White v. Osmose, Inc.,*
    204 F. Supp.2d 1309 (M.D. Ala. 2002) .........................................................14, 22

*Wren v. RGIS Inventory Specialists,*
    2007 U.S. Dist. LEXIS 95439 (N.D. Cal. Dec. 19, 2007).....................................25

STATUTES

29 U.S.C. § 213(a)(1)...........................................................................................17

**OTHER AUTHORITIES**

29 C.F.R. § 541.200(a)............................................................................17

29 C.F.R. § 541.202..............................................................................18

29 C.F.R. § 541.203(b)...........................................................................18

29 C.F.R. § 541.601..............................................................................17

## PRELIMINARY STATEMENT

Plaintiffs formerly worked for Defendant Merrill Lynch, Pierce, Fenner & Smith Incorporated ("MLPFS") as Financial Solutions Consultants ("FSC") and Financial Solutions Advisors ("FSAs").[1]  They now allege that Defendants[2] violated the Fair Labor Standards Act ("FLSA") by (1) refusing to allow non-exempt, overtime eligible FSCs and FSAs to record all overtime hours worked and otherwise "encouraged" FSCs to perform "off the clock" ("OTC") work, and (2) misclassifying eleven separate types of FSAs as exempt from the FLSA's overtime provisions.  Plaintiffs now seek to conditionally certify a class of and issue court-authorized notice to *all* non-exempt and exempt FSCs and FSAs employed by MLPFS over the past three years, regardless of whether those individuals actually performed any work off the clock, and without regard to the fact that these employees performed their jobs in vastly different ways, in different locations, and under different supervisors.  Plaintiffs, however, have fallen short of meeting their burden to demonstrate that other FSAs and FSCs are "similarly situated" to Plaintiffs and have been harmed by a common policy that violates the FLSA.

First, Plaintiffs have failed to present evidence that even suggests that MLPFS had a common policy, practice, or scheme to require (or even permit) non-exempt FSCs or FSAs to perform work off the clock.  At best, Plaintiffs have presented anecdotal evidence that they may have performed such work.  But this is a far cry from establishing a common policy across all of MLPFS' relevant operations, which spans three different facilities—for one of which (Arizona) the Plaintiffs have presented *no* evidence whatsoever.   And even if Plaintiffs themselves performed OTC work, that does not suggest that anyone else did, or that, if anyone else did, whether MLPFS knew of such work.  To the contrary, MLPFS' express policies and procedures

---

[1]     Prior to 2009, FSCs were referred to as Investment Solutions Consultants ("ISC"s), both non-exempt positions, and FSAs were referred to as Investment Services Advisors ("ISA"s), both exempt positions.

[2]     Plaintiffs at all times were employees of MLPFS.  Nevertheless, they also have named as defendants MLPFS' parent company, Merrill Lynch & Co, Inc., and its ultimate parent company, Bank of America Corporation.

at all times have required all overtime-eligible employees to record all of their time worked to the minute, and MLPFS paid employees for all of their time worked to the minute.

Second, Plaintiffs' claims for overtime compensation on behalf of allegedly misclassified FSAs raises numerous factual questions regarding whether any individual FSA was properly classified as exempt. These issues necessarily will only be able to be resolved on an individualized basis. For example, an analysis of whether Plaintiffs (or any other FSAs) satisfied the FLSA's administrative exemption will necessarily require an examination of the particular job duties performed by each FSA and how that FSA performed those duties.

Finally, not only are Plaintiffs not similarly situated to each other, they are not similarly situated to the putative class they seek to represent. Plaintiffs seek to represent all FSAs, but they have not presented any evidence that they are similarly situated to each of the eleven separate and distinct FSA positions. Accordingly, as discussed further herein, Plaintiffs' Motion should be denied in its entirety.

<u>**STATEMENT OF THE FACTS**</u>

**A.    The Merrill Edge Advisory Center**

MLPFS is a financial management and services company that provides its clients financial advice and investment banking services. DVN Decl. ¶2.[3] MLPFS' Global Wealth and Investment Management Department ("GWIM") provides clients with a premier level of wealth management and investment services by offering customized financial solutions designed to help clients reach their goals. *Id.* GWIM clients have access to a range of services, including Merrill Edge, which provides access to MLPFS investing and Bank of America banking services and products. *Id.* at ¶4.; JB at ¶4.

Merrill Edge is the marketing name for two businesses: (1) a self-directed online investing platform (www.merrilledge.com); and (2) the Merrill Edge Advisory Center

---

3    Citations to Declarations or Affirmations submitted in support of Defendants' Memorandum of Law in Opposition to Plaintiffs' Motion for Conditional Certification and Court-Authorized Notice are cited as "[Declarant's/Affiant's Initials] ¶ __"

("MEAC"), which offers team-based advice and guidance brokerage services via the group's phone-based service call centers.  DV¶ 3; JB¶4.  MEAC is Merrill Edge's person–to-person financial advice center.  *Id.*  MEAC clients work with a team of FSAs that help clients set goals, develop customized investment strategies, define specific action steps and provide proactive assistance to help clients stay on track with their financial goals.  JB ¶4.  MEAC is generally for clients who plan to invest $20,000 to $250,000 in investable assets through Merrill Edge.  JB ¶¶ 10-11.

### B.    Each FSA Team Has Separate and Distinct Job Responsibilities

MEAC employs FSCs and FSAs at three call centers nationwide: (1) Jacksonville, Florida; (2) Hopewell, New Jersey; and (3) Chandler, Arizona.  DVN ¶8.  The Jacksonville site and Hopewell site have been operational for the entire period of time relevant to this motion (*i.e.*, since at least March 2009).  *Id.* at 8.  The Chandler site began operating on or about October 15, 2010.  *Id.*

FSAs are divided into two segments: the Prospect Conversion Group and the Relationship Management Group ("RMG").  CT ¶10; DVN ¶ 9.  As discussed below, the Prospecting Group and RMG are further broken down into distinct and specialized teams.  DVN ¶9; CT ¶¶12-13.  Each team is supervised by a Team Lead who oversees a team of approximately ten to fifteen FSAs and is responsible for, *inter alia*, developing the FSAs on their team, managing the performance of the FSAs on their team, and any attendance and human resources issues that arise on their team.  JB ¶6; CT ¶ 13.  All FSAs must hold a Series 7/General Securities licensed from the Financial Industry Regulatory Authority (FINRA) and Series 66 license from the North American Securities Administrators Association (NASAA).  *Id.*  As outlined below, the differences among FSAs job duties and responsibilities and how they perform their jobs are significant.[4]  JB ¶ 14.

---

[4]    As of the end of 2011, the MEAC was reorganized and the Prospecting Group was phased out. However, each of the FSA segments below remains intact.

3

### 1.   <u>Relationship Management Group</u>

RMG teams only dealt with existing Merrill Edge clients, as opposed to trying to prospect for potential new clients.  The RMG was comprised of the following teams:

- **FSCs:**  Unlicensed[5] employees are referred to as FSCs.  *Id.*  Because they do not yet have the proper licensure, FSCs cannot provide advice to MEAC clients or trade securities. CT ¶14.  All new MEAC hires that want to become Financial Solutions Advisors (discussed below) begin as FSCs and spend their time training and studying for licensing exams.  JB ¶ 7. FSCs' job duties are limited to taking inbound telephone calls, handling service requests such as filling out paperwork, and determining whether a client needs to speak with an FSA.  JB ¶7; CT ¶14; EC ¶5.

- **Core 1 FSAs:**  Core 1 FSAs have obtained the appropriate licensure and registration, have completed Merrill Edge training, and can provide advice to MEAC clients.  CT ¶ 17.  Core 1 FSAs deliver advice and guidance to clients with less than $20,000 in assets invested (or to be invested) with MEAC.  *Id.* ¶ 18.  In addition to the responsibilities of an FSC, Core 1 FSAs speak with MEAC clients about portfolio and performance goals, objectives and time horizons and provide financial advice.  EC ¶ 7-8.  Throughout the time period relevant to this Motion, all FSCs and Core 1 FSAs have been (1) classified as non-exempt, (2) paid on an hourly basis, and (3) required to record all time worked.  *See, e.g.*, JB ¶27; DVN ¶19-23.

- **Core 2 FSAs:**  Core 2 FSAs provide advice, guidance, and portfolio reviews to MEAC clients who have invested (or intend to invest) between $20,000 and $50,000 in assets with MEAC, and high-potential Core 1 clients.  JB ¶10.

- **Premier FSAs** deliver advice and guidance to clients who have in excess of $50,000 in assets invested with MEAC, or have a new relationship with MEAC.  *Id.* at 11.

- **CDA (Client Deepening Advisor) FSAs:** provide on-boarding services for new clients with assets in excess of $ 50,000.00 (formerly $100,000.00).  JB ¶14.  These specialized

---

[5]       Pursuant to FINRA regulations, all FSAs must possess FINRA Series 7/63/65 or Series 7/66 licenses.

CDA FSAs develop and deliver comprehensive wealth management reports and strategies for clients with complex financial and investment needs.  *Id.*  CDA FSAs target clients with major life changes, are the most experienced FSAs, and are considered the top advisors.  *Id.*  Often they work with Merrill Lynch Financial Advisors in store-front offices to transition clients from working with an individual Financial Advisor in the office to working with the MEAC.  *Id.*  They help clients gain comfort with the MEAC process and personnel through their dedicated one-on-one relationship.  *Id.*

### 2.      Prospect Conversion Group

Separate and distinct from the RMG, the Prospect Conversion Group did not provide advice to anyone who is not an existing Merrill Edge client.  CT ¶27.  It is comprised of the following teams:

- **Rollover FSAs** work with clients who have recently separated from their jobs and whose former employer housed its 401(k) plan with Bank of America.  *Id.*  Rollover FSAs educate plan employees on transition services, distribution options, retail investment opportunities, provide them with options and benefits when becoming a MEAC client, and increase the overall retention rate of rollover assets from MLPFS/BOA kept retirement plans.  *Id.*

- **Merrill Edge Preferred Relationship Consultant ("MEPRC") FSAs** work with potential MEAC clients who have a banking relationship with Bank of America, but no pre-existing brokerage relationship.  MEPRC FSAs deliver client consultations and present solutions to potential clients across both banking and brokerage products and services.  *Id.*

- **Initial Assessment Team ("IAT") FSAs** serve as the initial point of contact for multiple account sourcing initiatives, including Bank of America call center customers or branch referrals.  *Id.*  IAT FSAs provide an initial financial review and direct clients to the appropriate service channel.  *Id.*

- **Merrill Edge Experience Team ("MEET") FSAs** facilitate prospect fulfillment through Merrill Edge marketing tactics, such as calls from individuals looking at the MEAC

website, Internet banner ads or radio ads.  *Id.*  MEET FSAs target self-directed account opening and funding.  *Id.*

- **Transition FSAs** serve as the primary point of contact for recently migrated and referred clients from Bank of America branches that are opening new MEAC accounts with assets ranging from $250,000.00 to $3,000,000.00.  *Id.*

- **Small Business FSAs** act as an initial point of contact for small business clients. They provide initial financial review to clients, and direct them to the appropriate person or team to meet their needs.  *Id.*

- **Retention FSAs** work with clients who have been identified as at-risk for leaving MEAC.  Retention FSAs' primary job duty is to try and resolve any problems a client has in order to ensure client satisfaction and maintain clients.  *Id.*

**C.     Named and Opt-In Plaintiffs**

(1) <u>Rene Hernandez:</u> He was first hired by MLPFS as a non-exempt ISC in August 2008 in Jacksonville, Florida.  He remained in that position until June 2010 when he was promoted to an exempt Core 2 FSA position.  DVN ¶29.  Hernandez was a Core 2 FSA until he resigned in August 2010.  *Id.*

(2) <u>Rebecca Heston:</u> She first worked for MLPFS as an ISC in March 2008 in Jacksonville, Florida.  *Id.* ¶ 31.  In November 2009 she was promoted to an exempt Core 2 FSA position.  *Id.*  She was terminated from MLPFS in January 2010 for unsatisfactory job performance.  *Id.*

(3) <u>Jeffrey Steinberg:</u> He began working for MLPFS in Jacksonville, Florida in January 2006 as an ISC.  *Id.* ¶33.  He was promoted to a Core 2 FSA position in August 2006.  *Id.* Steinberg worked as an exempt FSA on the Retention Team in February 2007.  *Id.*  He later was promoted to an exempt Premier FSA position in August 2007.  *Id.*  In May 2009, Steinberg returned to a Core 2 FSA position.  *Id.*  In November 2009, he was demoted back to a non-exempt FSC position.  *Id.*  In January 2010, Steinberg was terminated for unsatisfactory job performance.  *Id.*

(4) Eric Ebanks: He began working for MLPFS in January 2007 as an ISA on the Transition Team in Jacksonville, Florida. *Id.* ¶34. In December 2007 he was promoted to an FSA position on the Rollover Team. *Id.* He was terminated from MLPFS in May 2009 for unsatisfactory job performance. *Id.*

(5) Trinity Gray: He was hired by MLPFS into a division other than Merrill Edge in 2008. *Id.* ¶35. In December 2010, Gray came to the New Jersey MEAC as a non-exempt FSC. *Id.* Gray voluntarily resigned from MLPFS in May 2010. *Id.*

(6) William Rogers: He joined Merrill Edge and MEAC in May 2006 as an ISC. *Id.* ¶36. In May 2007, he was promoted to the exempt position of ISA. *Id.* For part of his tenure as an ISA he worked on the Premier Team. *Id.* Rogers resigned from MLPFS in December 2008. *Id.* He returned to work for MLPFS as an ISC in March of 2009. *Id.* Later that same month, he was promoted to an exempt ISA position. *Id.* Mr. Rogers then resigned MLPFS again in April 2010. *Id.*

(7) Betty Reynolds: She joined MLPFS as an ISC in Jacksonville, Florida in or around October 2008. *Id.* ¶37. Reynolds stayed in the ISC position until the title was changed in or near August 2009, when she became an FSC. *Id.* In or around June 2010 Reynolds left the MEAC. She worked in another non-exempt position for MLPFS until she abandoned her job in September 2010. *Id.*

While employed as FSCs and Core 1 FSAs, the named Plaintiffs were paid a significant amount of overtime. For example, Hernandez recorded overtime more than forty times during his brief tenure at the MEAC and was paid over $7,000.00 in overtime wages. *Id.* ¶30. Likewise, Heston recorded over forty instances of overtime work and was paid over $4,700.00 in overtime wages. *Id.* ¶ 32. Reynolds also was paid over $6,000.00 in overtime wages. *Id.* ¶38.

**D.    MLPFS' Policies Prohibit Working Off-the-Clock and Mandate that Non-Exempt Employees Record All Time Worked**

At all times relevant to this lawsuit, FSCs and FSAs (and their predecessor ISCs and ISAs positions) were subject to policies and procedures, and provided training, that clearly and

unequivocally (1) required them to accurately record all of their time worked to the minute, (2) prohibited employees from working "off the clock", and (3) mandated that they be paid for all of their time worked, including overtime.   DVN ¶20.   For example, the Timekeeping Policy provides in pertinent part:

> [a]ll overtime eligible associates are responsible for reporting all time worked, including any and all overtime . . .   This means entering the exact time, to the minute, even if it matches the default time schedule. . . .
>
> Associates should enter their own time, including start and end time, meal periods and any time off . . . .   Overtime-eligible associates are prohibited from performing work "off the clock" and not recording worked time. . . .   All hours worked must be accurately recorded.   Failure to accurately enter time worked may result in disciplinary action up to and including termination.
>
> By submitting time the associate is certifying that time entered, including start and stop times, is an accurate record of time worked (or non-worked) during the time period.

DVN Decl. ¶22, Ex. A.   MLPFS also trained employees and managers on their timekeeping policies and procedures.   For example, the 2010 Time Keeping Compliance Learner Guide states that:

> [a]ny overtime-eligible associate, who works overtime, including work completed at home, must be paid for all time worked.   Whether the manager authorized the overtime in advance or not, the associate must be paid.
> . . . .
>
> Associates are not allowed to volunteer to work for free.   You may want to stay late and work off the clock to get caught up.   If you are overtime eligible, you cannot.   Any overtime-eligible associate who works and does not accurately record time is subject to disciplinary action, up to and including termination.   Any manager who allows an overtime-eligible associate to work off the clock, or who becomes aware of it and does not address the issue, is also subject to these same disciplinary actions.

DVN Decl. ¶23, Ex. A; Philip A. Goldstein ["PAG"] Aff. Ex. B ("Please be aware that all overtime must be pre-approved in accordance with Company timekeeping rules").

Under its Code of Ethics, all MLPFS employees are required to maintain the integrity of MLPFS records. *Id.* ¶27, Ex. B. The Code of Ethics explains MLPFS's commitment to obeying all laws, expressly including wage and hour laws. The Code of Ethics requires all employees to report anything that they believe to be a violation of the law. *Id.*, Ex. C. If an FSC believes that their time records are incorrect, the FSC can (indeed, should) correct it, or ask their manager to correct it. DVN ¶21. In addition, MLPFS employees can call a centralized toll-free number with any employment-related issues, including questions regarding timekeeping and payroll. *Id.* ¶24.

Team Leads and Site Managers are not rewarded or penalized for the amount of overtime expenses incurred on their teams or at their sites, respectively. *Id.* ¶26; CT ¶38; EC ¶23; JB ¶33. There is no reward or incentive (compensation-based or otherwise) for Team Leads or Site Managers to reduce their overtime expenses. DVN ¶26; CT ¶37; EC ¶23; JB ¶33. Thus, because MEAC's labor budgets do not include overtime hours, neither Team Leads nor Site Managers are subject to discipline for incurring overtime hours (although they ***are*** subject to discipline if they allow overtime-eligible employees to work off the clock). *Id.*

There is no MLPFS policy prohibiting FSCs from working, recording, and receiving compensation for overtime. To the contrary, as discussed above, MLPFS policy expressly requires all employees to accurately record all time worked, including overtime, and the MLPFS will pay for all hours worked.

**E.    The FSA Positions Require the Regular Exercise of Discretion and Independent Judgment**

FSAs work with clients to help them select a diversified portfolio for their specific financial needs. CT ¶30; JB ¶13. In constructing these diversified portfolios, FSAs utilize an "Investment Process" created by MLPFS. EC ¶¶14-15; JB ¶13-14. Within the Investment Process, FSAs help a client define and establish their objectives, develop a financial strategy, assemble portfolios with desired risk characteristics, and then monitor, manage, and rebalance

the client's portfolio.  *Id.*  When assembling a portfolio, FSAs consider, *inter alia*, a range of investment goals and products, the client's risk tolerance, and time horizons.  *Id.*

But while MLPFS has created its Investment Process, which helps ensure that MLPFS and FSAs comply with various regulatory requirements, within the Investment Process, FSAs have significant freedom and flexibility to assist clients with their financial needs.  JB ¶13; EC ¶¶14-15.  For example, there are ***several thousand*** of each of the following financial products that an FSA can select from to recommend to a client: mutual funds, corporate, government and municipal bonds, treasuries, options, certificates of deposit, Exchange Traded Funds, stocks, money markets, managed products and preferred stocks.  JB ¶25.  Moreover, FSAs can make recommendations to their Team Leads to deviate from the "Investment Process" when, in the opinion of the FSA, such a deviation may be warranted.  CT ¶25.  For example, if an FSA believes that a particular investment option not within the Investment Process might be suitable for a client, the FSA can suggest this to the Team Lead.  *Id.*  The Team Leads almost always accept these recommendations.  CT ¶23-25.

## ARGUMENT

## I.   PLAINTIFFS BEAR THE BURDEN OF PROOF TO DEMONSTRATE THEY WERE SUBJECT TO A SINGLE DECISION, POLICY, OR PLAN THAT VIOLATED THE LAW

In a putative collection under the FLSA, courts should only facilitate the sending of notice if the Court makes a "preliminary determination that the employees who will be receiving the notice are *similarly situated* to the plaintiff."  *Amendola v. Bristol-Myers Squibb Co.*, 558 F. Supp.2d 459, 467 (S.D.N.Y. 2008) (emphasis added); *see also Hoffman-La Roche, Inc. v. Sperling*, 493 U.S. 165, 169-70 (1989) (holding that a collective action should only be conditionally certified where the plaintiffs have shown that there are "other employees similarly situated").

At this stage, the burden remains with Plaintiffs to establish that they and the putative class members they wish to represent are sufficiently "similarly situated" in that they were all

victims of a *single decision, policy, or plan that violated the law.  See Morales v. Plantworks, Inc.*, 2006 U.S. Dist. LEXIS 4267, at *2 (S.D.N.Y. Feb. 1, 2006); *Prizmic v. Armour, Inc.*, 2006 U.S. Dist. LEXIS 42627, at *4 (E.D.N.Y. June 12, 2006); *Diaz v. Elec. Boutique of Am., Inc.*, 2005 U.S. Dist. LEXIS 30382, at *10 (W.D.N.Y. Oct. 17, 2005).  This requires a showing of a "factual nexus" between the named plaintiffs' situation and the situations of the other current and former employees whom they seek to join to the collective *beyond the mere facts of job descriptions and pay provisions.  See, e.g., Diaz*, 2005 U.S. Dist. LEXIS 30382, at *10; *see also Prizmic*, 2006 U.S. Dist. LEXIS 42627, at *4.  Plaintiffs must make this showing with competent evidence, and neither unsupported assertions nor conclusory allegations will suffice.  *See Khan v. Airport Mgmt. Servs., LLC*, 2011 U.S. Dist. LEXIS 133134, at *12-*14 (S.D.N.Y. Nov. 16, 2011) (denying authorization of collective action notice where the plaintiff relied on "unsupported assertions" that other employees were similarly situated even though plaintiff submitted employee declarations to support his claim); *see also Guillen v. Marshalls of MA, Inc.*, 2012 U.S. Dist. LEXIS 4364, at *11-*12 (S.D.N.Y. Jan. 13, 2012) ("*Guillen II*") (requiring "actual evidence" that plaintiff was similarly situated to the potential class members and that the "mere allegations" made by plaintiff were not sufficient to obtain certification).  As discussed below, Plaintiffs have failed to meet their burden.

## II.  PLAINTIFFS HAVE FAILED TO MEET THEIR BURDEN OF PROOF TO ESTABLISH THAT THEY AND THE PERSONS TO WHOM THEY WISH TO HAVE NOTICE ISSUED WERE VICTIMS OF A SINGLE DECISION, POLICY OR PLAN THAT VIOLATED THE LAW WITH RESPECT TO THEIR "OFF THE CLOCK" CLAIMS

Motions for conditional certification and requests to facilitate notice are properly denied when adjudication of the putative plaintiffs' claims would require individualized inquiries.  *See, e.g., Diaz*, 2005 U.S. Dist. LEXIS 30382, at *16-17 (holding that the plaintiff's allegations that he worked off-the-clock and that his timesheets were improperly altered "are too individualized to warrant collective action treatment.").  In off the clock claims, such as those presented here, the primary issues are highly individualized and courts frequently deny conditional certification

of FLSA collective actions raising such claims.  *See id.*; *see also Eng-Hatcher v. Sprint Nextel Corp.*, 2009 U.S. Dist. LEXIS 127262, at *15 (S.D.N.Y. Nov. 13, 2009)(denying conditional certification for OTC work where the size of sales quotas relevant to the OTC work "var[ied] widely by store, by month, with the number of employees in the store, with past store performance, and with other factors."); *Gillian v. Starjem Rest. Corp.*, 2011 U.S. Dist. LEXIS 115833, at *19 (S.D.N.Y. Oct. 3, 2011) (denying conditional certification because the alleged overtime violations depended on facts specific to each *individual*, including hours each individual worked every shift and week); *Lawrence v. Philadelphia*, 2004 U.S. Dist. LEXIS 8445, at *2 (E.D. Pa. Apr. 29, 2004) ("The 'off-the-clock' claim does not involve regularly scheduled time that is worked by all members of the class. Rather, each of the Plaintiffs may potentially claim that on any given day he or she arrived early or departed outside of their regularly scheduled hours and were not compensated for such. The circumstances of those individual claims potentially vary too widely to conclude that in regard to their 'off-the-clock' claim, the Plaintiffs are similarly situated.").

Plaintiffs have failed to meet their burden to establish that they and putative class members were subject to a single decision, policy, or plan that violated the law.  Rather, the adjudication of Plaintiffs' OTC claims necessarily will involve resolution of countless individualized issues.

A.     **MLPFS Disseminated and Enforced Policies Requiring That Employees Accurately Record All of Their Time Worked and That They Be Paid For All Time Worked.**

Plaintiffs bear the burden of proof to establish that they and putative class members were subject to a single decision, policy, or plan that violated the law.  But, as an initial matter, the overwhelming evidence demonstrates that MLPFS promulgates and enforces a company-wide policy that strictly requires that overtime-eligible employees accurately record all of their time worked to the minute, and that employees be paid for all of their time worked.  DVN ¶22-24, Ex. A-B.   Indeed MLPFS stresses this policy in numerous formal documents including human

resources policies, Code of Ethics, and training materials that employees must read and acknowledge.  In fact, several of the Plaintiffs here regularly were paid for overtime.  For example, Plaintiffs Hernandez and Heston recorded overtime on more than *forty occasions*, and received over $7,000.00 and $4,700.00 respectively in overtime compensation.  DVN ¶¶ 30, 32.  MLPFS also paid Betty Reynolds over $6,000.00 in overtime wages.  *Id.* ¶38.

> **B.     Plaintiffs Have Presented No Evidence of a *De Facto* Policy Requiring or Even Permitting Off-the-Clock Work.**

Courts in this Circuit and others have recognized that well-disseminated policies like the ones issued and enforced by MLPFS present a significant obstacle to any claims of class treatment for alleged off-the-clock work.  *See, e.g.*, *Eng-Hatcher*, 2009 U.S. Dist. LEXIS 127262 at *10-*11,*14 (denying certification of collective and class actions where plaintiff alleged legal reward policies incentivized managers to act illegally); *Saleen v. Waste Mgmnt., Inc.*, 2009 U.S. Dist. LEXIS 49891, at *13-14 (D. Minn. June 15, 2009); *Thompson v. Speedway SuperAmerica, LLC*, 2009 U.S. Dist. LEXIS 3816, at *4-6 (D. Minn. Jan. 20, 2009).  To overcome that obstacle, Plaintiffs must present evidence that they and other employees were not compensated for worked time "'because of a corporate decision to ignore [the Company's] published policies.'"  *Saleen*, 2009 U.S. Dist. LEXIS 49891, at *13-14 (citation omitted); *see also Eng-Hatcher*, 2009 U.S. Dist. LEXIS 127262, at *10-11,*14.  Plaintiffs' evidence must show that they and the other employees they seek to join to this lawsuit were not compensated for reasons other than "human error or a rogue store manager."  *Thompson*, 2009 U.S. Dist. LEXIS 3816, at *5-6.

Plaintiffs have presented no such evidence.  Instead, they rely exclusively on unsupported supposition and speculation that run counter to MLPFS' express policies prohibiting OTC work and requiring that employees be paid for all of their time worked.  In support of their Motion, Plaintiffs have offered only a handful of individual, self-serving declarations that tell stories of individual instances of supposed OTC work.[6]  At best, this suggests "human error or a rogue store manager."  *Thompson*, 2009 U.S. Dist. LEXIS 3816, at *5-6.  It does not support any

---

[6]     And even then, they have not offered *any* evidence regarding MLPFS' Chandler, Arizona facility.

13

finding of a *de facto* policy or procedure permitting or requiring off the clock work. *See, e.g.*, *Guillen II*, 2012 U.S. Dist. LEXIS 4364, at *4 (finding five affidavits of employees and former employees to be insufficient to show the plaintiffs were similarly situated); *Khan*, 2011 U.S. Dist. LEXIS 133134, at *9-10 (denying authorization of collective action notice where the plaintiff offered three former employees' declarations); *Gillian*, 2011 U.S. Dist. LEXIS 115833 at *19 (denying conditional certification because the plaintiff only submitted three vague declarations that overtime was not paid).

### C.   Plaintiffs' Off-the-Clock Claims Will Require Individualized Analysis and Are Unsuitable For Collective Treatment

Apart from the lack of evidence, Plaintiffs' OTC claims are not appropriate for collective treatment because they necessarily will require individualized analysis and resolution.  In order to prevail on an off OTC claim, Plaintiffs bear the burden of proving that they performed work for which they were not compensated, and that MLPFS knew or should have known of the work. *See, e.g.*, *Singh v. City of New York*, 418 F. Supp.2d 390, 397 (S.D.N.Y. 2005) (employee "is only entitled to compensation for those hours of work performed of which the employer had actual or constructive knowledge").

Plaintiffs' fanciful theory in support of their OTC claim is that MLPFS established performance targets that were unattainable in a forty-hour work week, and that MLPFS did not pay them overtime when they worked more than forty hours per week attempting to attain those goals.  Pl. Brief. at pp.14-17.  OTC claims of this type, however, are too individualized to warrant collective action treatment. *See Eng-Hatcher*, 2009 U.S. Dist. LEXIS 127262, at *9-*10, *15-*16 (denying certification of collective and class actions and finding that policies "maximizing sales and minimizing overtime" were insufficient to infer that all managers were beholden to a policy forcing workers to work OTC, especially where employer had a written policy requiring payment for all time worked); *Gillian*, 2011 U.S. Dist. LEXIS 115833, at *19 (refusing to grant conditional certification because of the individualized nature of the OTC analysis).  At a minimum, Plaintiffs are not similarly situated to the numerous individuals who

are able to perform their job the way MLPFS intended and attain their goals within a 40-hour work week, or otherwise record (and are paid for) their overtime hours.  *See generally* Plaintiffs' Declarations.

The unsuitability of collective treatment is particularly apparent in this case.  Among other things, the Court would need to determine for each individual for each day that they worked whether and to what extent any work performed was not reported to MLPFS; if not, why not; and whether the unrecorded work time would have resulted in the employee having worked over 40 hours in the week and thereby triggering overtime pay.  *See, e.g.*, *White*, 204 F. Supp.2d at 1318 ("Because [the employer] did in fact pay *some* overtime, it is likely that any particular claim will require specific, individualized proof as to any hours that [the employer] refused to pay.").  Further still, individualized factual questions necessarily will arise for each Plaintiff for each instance of supposed OTC work concerning whether MLPFS knew or should have known of the OTC work.  *See, e.g.*, *Singh*, 418 F. Supp.2d at 397; *Darrikhuma v. Southland Corp.*, 975 F. Supp. 778, 783-84 (D. Md. 1997) (dismissing off-the-clock claim where plaintiff's supervisor did not know plaintiff performed off-the-clock work), *aff'd*, 129 F.3d 1258 (4th Cir. 1997).  Quite simply, there is no class-wide method of determining if MLPFS knew or should have known that a particular individual worked OTC on any particular occasion.

Courts have routinely denied motions to conditionally certify FLSA OTC cases where such individualized findings would be necessary.  *See, e.g.*, *Eng-Hatcher*, 2009 U.S. Dist. LEXIS 127262, at *15 (denying conditional certification for OTC claims where the size of quotas relevant to the OTC work "var[ied] widely by store, by month, with the number of employees in the store, with past store performance, and with other factors."); *Gillian*, 2011 U.S. Dist. LEXIS 115833, at *19 (denying conditional certification, reasoning that "…overtime provisions of the FLSA depend[] on the number of hours each individual worked on a particular shift, as well as the number of hours each individual worked in a particular week."); *Hinojos v. Home Depot, Inc.*, 2006 U.S. Dist. LEXIS 95434, at *6 (D. Nev. Dec. 1, 2006) (denying motion for conditional certification of OTC claims where plaintiffs failed to identify common policy and stating that

"the need for separate mini-trials to resolve each individual's claim . . . is the antithesis of collective action treatment").  Because Plaintiffs' OTC claims are necessarily individualized, and because Plaintiffs have not offered any evidence that even hints, much less establishes, that MLPFS had policy that violates the FLSA and that affects a nationwide group of similarly situated employees, their Motion should be denied.

## III.   PLAINTIFFS HAVE FAILED TO MEET THEIR BURDEN OF PROOF TO ESTABLISH THAT THEY WERE VICTIMS OF A SINGLE DECISION, POLICY, OR PLAN THAT VIOLATED THE LAW WITH REGARD TO THEIR MISCLASSIFICATION CLAIMS

Plaintiffs claim that all FSAs are similarly situated because "they challenge Merrill's common policy of misclassifying Experienced FSAs as exempt."  (Pl. Br. at 17). Numerous courts, including this Court, have repeatedly rejected the theory that a "mere classification" as exempt is sufficient to establish a basis for proceeding collectively.  *Guillen II*, 2012 U.S. Dist. LEXIS 4364, at \*14 (rejecting the contention that a "mere classification" as exempt is sufficient to show the plaintiffs were similarly situated); *Khan*, 2011 U.S. Dist. LEXIS 133134, at \*12 ("it is not sufficient for [plaintiff] to show that he and the proposed class operated under the same job description") (quoting *Guillen I*, 750 F. Supp. 2d at 476); *Trinh v. JP Morgan Chase & Co.*, 2008 U.S. Dist. LEXIS 33016, at \*4 (S.D. Cal. Apr. 22, 2008) ("merely alleging that a class of employees was wrongly designated 'exempt' does not constitute a showing of an unlawful institution-wide policy").  Instead, as discussed above, Plaintiffs bear the burden of proof to demonstrate that they and the persons to whom they wish to issue notice were the victims of a single decision, policy or plan *that violated the law.  See Morales*, 2006 U.S. Dist. LEXIS 4267, at \*2; *Prizmic*, 2006 U.S. Dist. LEXIS 42627, at \*4; *Diaz*, 2005 U.S. Dist. LEXIS 30382, at \*10. This burden requires Plaintiffs to show a "factual nexus" between their situation and "the situations of their current and former employees whom plaintiffs seek to join" to the collective *beyond the mere facts of job descriptions and pay provisions.  Diaz*, 2005 U.S. Dist. LEXIS 30382, at \*10; *see also Prizmic*, 2006 U.S. Dist. LEXIS 42627, at \*4.  Plaintiffs have failed to do so here.

**A.    The Application of the Administrative Exemption To the Facts of This Case Prevents Plaintiffs From Establishing That They Were all Subject To A Single Decision, Policy, or Plan *that Violated the Law.***

The FLSA exempts from overtime pay requirements, *inter alia*, "[a]ny employee employed in a bona fide . . . administrative . . . capacity," 29 U.S.C. § 213(a)(1).  To determine whether any particular FSA meets the administrative exemption, the Court must determine whether the FSA (1) is compensated on a "salary basis"; (2) has a primary duty "related to management or general business operations of the employer or the employer's customers;" and (3) has a primary duty that requires "the exercise of discretion and independent judgment with respect to matters of significance."  29 C.F.R. § 541.200(a).[7]  Here, Plaintiffs have not suggested (much less presented any evidence) that *all* FSAs *per se* do not qualify for the administrative exemption because they do not meet the salary basis requirement.  To the contrary, while working as exempt FSAs, all of the Plaintiffs earned an annual salary of at least $40,000.  Thus, Plaintiffs' only basis for asserting that they were subject to a "single decision, policy, or plan that violated the law" must be that, as a group, FSAs do not have as their primary duty functions that "relate[]to the management or general business operations of MLPFS or its customers" or that, as a group, FSAs do not exercise sufficient discretion and independent judgment to satisfy the exemption.  Neither inquiry is amenable to collective treatment.

Determining Plaintiffs' exempt status - as well as the exempt status of the purportedly similarly situated individuals whom they seek to represent – necessarily will involve an individualized analysis of each Plaintiffs (and every other similarly-situated individual's) daily job duties, the time spent performing those duties, whether those job duties were performed

---

[7]     In addition to the administrative exemption, putative class members also may qualify for additional exemptions, including but not limited to the highly-compensated worker exemption, which renders exempt from overtime any employee who (i) has annual compensation of at least $100,000, including at least $455 per week on a salary basis; and (ii) "customarily and regularly performs any one or more of the exempt duties or responsibilities of an . . ., administrative . . . employee."  29 C.F.R. § 541.601.  This will also call for an individualized analysis.  *See, e.g.*, *In re Wells Fargo Home Mortg. Overtime Pay Litig.*, 527 F. Supp.2d 1053, 1067 (N.D. Cal. 2007) (highly compensated exemption "will involve an individualized analysis not only of job duties but of the dollar amount of each [employee's] compensation.").

under the administrative and/or highly compensated employee exemption tests of the FLSA, and whether each individual exercises the requisite level of discretion and independent judgment to satisfy the exemption.[8]  *See* 29 C.F.R. § 541.202; *Mike v. Safeco Ins. Co. of Am.*, 274 F. Supp.2d 216, 220 (D. Conn. 2003) ("[d]etermining whether an employee is exempt is extremely individual[ized] and fact-intensive, requiring a detailed analysis of the time spent performing administrative duties and a careful factual analysis of the full range of the employee's job duties and responsibilities.") (internal quotations omitted).

Recognizing that application of the administrative exemption necessarily requires highly-individualized proof, courts have routinely denied conditional collective certification in cases involving application of these exemptions.  *See, e.g.*, *Forney v. TTX Co.*, 2006 U.S. Dist. LEXIS 30092, at *6-9 (N.D. Ill. Apr. 17, 2006) (denying conditional certification where plaintiff claimed that accountants were misclassified under administrative exemption because "certification of a collective action would require determination on whether each potential claimant's qualifications satisfy the regulatory requirements. This determination would be fact-intensive and individualized."); *Diaz*, 2005 U.S. Dist. LEXIS 30382 (concluding that despite identical job titles, employees in different locations and with different supervisors were not similarly situated for FLSA purposes, and would have necessitated individualized fact-findings); *Pfohl v. Farmers Ins. Group*, 2004 U.S. Dist. LEXIS 6447, at *27 (CD. Cal. Mar. 1, 2004) ("[D]iffering job duties and [an] individualized inquiry to determine whether these varying duties

---

[8]      The United States Department of Labor specifically has recognized that persons performing the precise duties of the FSAs in this case necessarily qualify for the administrative exemption.  *See* 29 C.F.R. § 541.203(b) ("Employees in the financial services industry generally meet the duties requirements for the administrative exemption if their duties include work such as collecting and analyzing information regarding the customer's income, assets, investments or debts; determining which financial products best meet the customer's needs and financial circumstances; advising the customer regarding the advantages and disadvantages of different financial products; and marketing, servicing or promoting the employer's financial products. However, an employee whose primary duty is selling financial products does not qualify for the administrative exemption.").  Thus, the only element of the administrative exemption that can truly be at issue is whether Plaintiffs (and other FSAs) exercised sufficient discretion and independent judgment to qualify for the exemption.  Given the evidence before the Court, this inquiry will necessarily devolve into individualized mini-trials regarding the nature and extent of discretion exercised by each individual FSA.

meet the administrative exemption preclude a collective action."); *Mike*, 274 F. Supp.2d at 220-21 (denying certification where overtime claim implicated administrative exemption "because the proof in the case [was] specific to the individual [and] . . . any other plaintiff would also have to present specific evidence of his or her daily tasks, and the court would have to apply the regulations on an individual basis . . . [and] engage in an ad hoc inquiry for each proposed plaintiff to determine whether his or her job responsibilities were similar to [plaintiff's]").  The highly individualized nature of the necessary inquiries establishes that, regardless of whether any individual Plaintiff or other FSA was misclassified, there is no *single* decision, policy or plan that violated the law.  *See Morales*, 2006 U.S. Dist. LEXIS 4267, at *2; *see also Wal-Mart Stores, Inc. v. Dukes*, 131 S.Ct. 2541, 2551 (2011) (noting that to establish that there are common questions of law or fact in a lawsuit even under the relatively lenient standard of FED. R. CIV. PROC. 23(a), the common question "must be of such a nature that it is capable of classwide resolution--which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.").

In addition to an FSA's individual experience and expertise, the particular FSA position and MEAC clients with whom they deal has a substantial effect on the complexity of their daily duties and the judgment and discretion that they brought to bear on their jobs.  *See, e.g.*, PAG Aff. Ex. D (Plaintiff Steinberg "[m]anaged the assets of many clients, each with unique needs, providing financial products and solutions tailored to their specific goals, objectives, and risk tolerance. . . . ").  As set forth above, each FSA segment has a distinct set of responsibilities and a separate role within the MEAC organization.  JB ¶13; EC ¶12.  For example, Core 2 FSAs manage relationships with clients with assets up to $50,000, whereas Transition FSAs interact with clients with assets ranging from $250,000 to $3,000,000.  EC ¶13-14; DVN ¶¶ 12-19.  With the range of options available to a client with $250,000 or more to invest, a Transition FSA must approach and analyze a client's financial needs much differently than a Core 2 FSA would with a client with assets of $30,000.  *Id.*

19

Similarly, recommending an exception to the "Investment Process" not only necessitates that an FSA have a firm grasp of the available financial products and their features, but also requires analysis of a client's financial circumstances -- including income, assets, investments, and debts -- and how those relate to the viability of the proposed financial plan.  Indeed, the administrative exemption's requirement of the exercise of discretion and independent judgment presents significant variation and factual complexity in determining whether FSAs are properly classified as exempt.  CT ¶¶29-30; JB ¶¶24-26.  For example, whether any given FSA's navigation of the market conditions and a client's financial circumstances involved sufficient exercise of discretion and independent judgment to meet the administrative exemption is a complex inquiry.  *Id.*  That determination is fact-intensive and highly individualized.  The evidence bearing on how one FSA performed his/her job duties will have no bearing on whether any member of the putative class exercised discretion and independent judgment.

Plaintiffs themselves have admitted that they had to exercise discretion and independent judgment as FSAs.  For example, Plaintiff Steinberg has described that, in his role as an FSA he *"[m]anaged* the assets of many clients, *each with unique needs,* providing financial products and solutions *tailored* to their specific goals, objectives, and risk tolerance.."  PAG Aff. Ex. D (emphasis added).  He also created "*customized spreadsheets and reports* for both clients and internal use."  *Id.* (emphasis added).  Plaintiff Hernandez *"appl[ied] key principles appropriately to the individual client's investment needs*."  *Id.* Ex. A (emphasis added).  Plaintiff Gray described his role as being "proactive[ ]" and that he "*structure[d]* investment portfolios that match the client's Investment Profile and Risk Tolerance."  *Id.* at Ex. C (emphasis added).  Therefore, undertaking to resolve the applicability of the administrative exemption to the FSAs on a collective action basis would give rise to a factual morass that would be inconsistent with any notion of judicial economy.

**B.** **Plaintiffs Have Not Met Their Burden of Proof To Establish They Are Similarly Situated to Other FSAs, or that Other FSAs Are Similarly Situated to Each Other.**

Plaintiffs have failed to meet their burden to establish that they are similarly situated enough to other FSAs to justify granting conditional certification and sending notice to all other FSAs throughout the United States, or that other FSAs are similarly situated to one another.

As an initial matter, none of the Plaintiffs worked in the Chandler, Arizona facility.  *See generally* Plaintiffs' Declarations.  None of the Plaintiffs worked on the CDA, MEET, IAT, MEPRC, or Small Business Teams.  Plaintiffs also offered no evidence regarding anyone who worked at the Chandler facility or on the CDA, MEET, IAT, MEPRC, or Small Business Teams.  Accordingly, at a minimum, Plaintiffs have failed to meet their burden to support conditionally certifying a collective including persons who worked in Chandler or on these teams.

Plaintiffs' also suggest that all FSAs are similarly situated no matter what the nature of their duties and responsibilities simply because they held the same job title and Plaintiffs claim that they all have been wrongfully denied overtime.  But adopting Plaintiffs' position ignores the reality that Plaintiffs and the FSAs they seek to represent worked in different positions with distinct and separate job duties and responsibilities, in different locations, under different supervisors and managers.  As set forth above, the class proposed by Plaintiffs includes *eleven* different FSA positions, in three different locations, working under dozens of different supervisors and managers.  Each position materially differs in the duties and responsibilities from the other positions.  Moreover, how each individual performs their duties will materially differ based upon their own style and preferences, as well as that of their particular supervisor and/or manager.  Because each FSA position has materially different job responsibilities, they are not similarly situated and cannot be conditionally certified.  *See, e.g.*, *Khan*, 2011 U.S. Dist. LEXIS 133134, at *17-18 (noting that the proposed class of all "managers" was too broad where defendants maintained sixteen different managerial titles and each had different responsibilities); *Trinh*, 2008 U.S. Dist. LEXIS 33016, at *4 (denying conditional certification where plaintiffs simply state that plaintiffs and members of the putative class had essentially the same job

description and training and were compensated in the same manner and finding the affiants' "speculative beliefs" that other workers were similarly situated insufficient); *Freeman v. Wal-Mart Stores, Inc.*, 256 F. Supp.2d 941, 945 (W.D. Ark. 2003) (refusing conditional certification of plaintiff's proposed class of all employees below officer level because of "material differences in the duties and responsibilities of those employees"); *White v. Osmose, Inc.*, 204 F. Supp.2d 1309, 1314-15 (M.D. Ala. 2002) (excluding crewman from a conditional class of foreman, finding the job duties of the two classes to be too dissimilar).

In an attempt to overcome these glaring deficiencies, Plaintiffs' attempt to create an illusion of similarity by simply averring that all FSAs performed the same job duties.  Pl. Brief. p. 8-9, 18-19.  This, without more, is insufficient to establish that all FSAs are similarly situated. *See Trinh*, 2008 U.S. Dist. LEXIS 33016, at *8 (denying certification where plaintiffs argued that "members of the putative class had essentially the same job description").  Even as to the positions for which Plaintiffs have held, the job descriptions and postings offered do not contain information that is sufficiently detailed to have any bearing on whether individuals with that title were "similarly situated" with respect to the proper application of any overtime exemption or other similarity circumstance that would make this case proper for collective action treatment. For that reason, courts have recognized that the minimal information provided in job descriptions is not probative of the issues posed by a motion for conditional certification.  *See, e.g.*, *Forney*, 2006 U.S. Dist. LEXIS 30092, at *8 ("[R]eliance on job descriptions is unpersuasive. Whether similarly situated employees exist depends on the employees' actual qualifications and day-to-day duties, rather than their job descriptions").

Accordingly, Plaintiffs' Motion should be denied in its entirety.

## IV.    PLAINTIFFS' PROPOSED NOTICE SHOULD BE REJECTED

For the reasons set forth above, issuance of notice in this action would be inconsistent with the requirements of the FLSA and Defendants dispute that any notice should be authorized

by this Court.  Defendants prophylactically address herein Plaintiffs' proposed form of notice in case the Court determines that notice is appropriate for any group.

To the extent the Court is inclined to conditionally certify any class and order any notice to be sent to any individuals pertaining to this case, the Court should exercise its authority to manage that communication and ensure that it is not used to cause unnecessary litigation.  Any notice should be disseminated by a third-party notice administrator rather than Plaintiffs' counsel.  Plaintiffs request for the posting of notice at the call centers also is unwarranted as well as their expansive request for certain personal information.

### A.      Plaintiffs' Proposed Notice is Objectionable

Defendants note a number of the more glaring defects in the proposed notice.  First, the proposed notice is deficient because Plaintiffs improperly refer to FLSA § 216(b) language when they state that recipients of the notice are "'similarly situated' to other FSAs employed by Merrill."  Second, the proposed notice fails to fully and adequately describe Defendants' position and their defenses asserted in this action.  Third, no warning regarding retaliation is necessary when there is no evidence or allegation of retaliation.  Fourth, the proposed notice does not require each opt-in to respond to Defendants' written discovery requests.  Fifth, the proposed notice fails to identify the locations at which Plaintiffs and the putative class worked.  Sixth, the proposed notice fails to adequately describe the FSC and FSA positions and the different types of FSAs that were employed by MLPFS during the relevant time period and should be limited only to those FSA positions which Plaintiffs held.  Seventh, the proposed notice improperly advises putative class members that they should contact Plaintiffs' attorneys directly before they have made a decision as to whether they wish to be represented by Plaintiffs' counsel.  Eighth, the proposed notice fails to advise that if an individual opts-in to the lawsuit, they may be required to travel to New York for depositions or participating in trial if necessary.  Ninth, the phrase "Court Authorized Notice" and the Court's name should not appear at the top of the notice as it gives the impression the litigation is endorsed by the Court.

Thus, if the Court grants Plaintiffs' FLSA motion in whole or in part, the Court should order the parties to meet and confer in good faith to draft a mutually agreeable notice that be jointly submitted to the Court for approval.  In the event the parties cannot agree, Defendants respectfully request the opportunity to submit their own notice and to be heard by the Court.

### B.    Notice Should Be Disseminated By Mail By a Third-Party Administrator

If the Court approves conditional certification, MLPFS should only be required to provide the name and last known mailing address of the persons to receive notice, and to provide it only to a third-party administrator.  Plaintiffs have not provided any rationale to support their request for private and personal information of members of the putative class such as telephone numbers, email addresses, and social security numbers.  Such information is unnecessary for sending out notice.  *See, e.g., Hinterberger v. Catholic Health Sys.*, 2009 U.S. Dist. LEXIS 97944, at *36 (W.D.N.Y. Oct. 21, 2009) ("The Court agrees that, in the interest of privacy, CHS need not produce phone numbers, social security numbers, dates of birth and e-mail addresses.").  Indeed, Plaintiffs have not and cannot present a compelling reason to justify the production of this information where notice could be provided without doing so.

Moreover, to the extent the Court orders notice to be sent out, it should be handled by a third-party administrator.  This will help maintain and protect the integrity of the personal and private information of MLPFS' current and former employees, as well as assist in maintaining the integrity of the notice process. [9]  *See Hoffman-LaRoche, Inc. v. Sperling*, 493 U.S. 165, 172 (1989) ("By monitoring preparation and distribution of the notice, a court can ensure that it is timely, accurate, and informative.").  Courts in the Second Circuit and throughout the country have recognized the value of using third-party administrators rather than plaintiffs' counsel, to provide notice to potential class members.  *See, e.g., Sand v. Greenberg*, 2011 U.S. Dist. LEXIS 36266, at * 12 (S.D.N.Y. Mar. 22, 2011); *Barnwell v. Corr. Corp. of Am.*, 2008 U.S. Dist.

---

[9]    One concern about disclosing the information directly to Plaintiffs' counsel is the potential for improper solicitation of consent forms.  One of the law firms representing Plaintiffs previously has been sanctioned for improper telephonic solicitation efforts.  *See Hamm v. TBC Corp.*, 345 Fed. Appx. 406 (11th Cir. 2009).

LEXIS 104230, at *26-29  (D. Kan. Dec. 9, 2008); *Wren v. RGIS Inventory Specialists*, 2007 U.S. Dist. LEXIS 95439, at *30 (N.D. Cal. Dec. 19, 2007).

### C. Plaintiffs Should Not Be Entitled to Post Notice at MEAC Call Centers or to Disseminate a Second Notice

Plaintiffs also request "Merrill to post the notice at the work locations of all Potential Opt-In Plaintiffs."  *See* Pl. Brief at p. 24.  But Plaintiffs have failed to identify any compelling need for such an intrusion into Defendants' business affairs.  Further, because all current MEAC employees that might be members of the putative class will receive the notice by mail, Defendants should not be required to post the notice in the workplace.  *See Hinterberger*, 2009 U.S. Dist. LEXIS 97944, at *40-42.  Likewise, Plaintiffs have not presented any reason why the Court should allow them to send a second notice other than that people "often disregard collective action notices."  Pl. Brief p. 23.  If a putative class member want to opt-in to the action, one notice should be sufficient to alert them of the matter.

### CONCLUSION

For all of the foregoing reasons, Defendants respectfully request that the Court deny Plaintiffs' Motion for Conditional Collective Certification and Court Authorized Notice in its entirety.

Dated: New York, New York
        March 29, 2012

**McGUIREWOODS LLP**

By: */s/* Philip A. Goldstein_____
        Michael D. Mandel (*pro hac vice*)
        Philip A. Goldstein (PAG-0908)

        Attorneys for Defendants

\37911356.7